*L. D. Burns Jr.,* contra.

32702.   HARRIS *v.* TERRELL.

Decided February 23, 1950.

*Maddox & Maddox,* for plaintiff.

*Wright & Scoggin, Frank S. Griffin,* for defendant.

MacINTYRE, P. J. So far as this record reveals, no demurrer was filed to the petition other than the oral motion to dismiss for lack of jurisdiction in the superior court. The plaintiff testified in part: "I am a practicing attorney admitted to practice in the State of Georgia and having an office here in Rome. . . This is my fifty-first year that I have been practicing law. I was solicitor of the City Court of Floyd County for four years. For

over two year I was assistant solicitor-general. During those periods of time I made up what is known as insolvent court cost lists of officers of the court. Therefore, I· am familiar with the manner and way it is done. As far as I know (outside [of] some attorney who has been solicitor of our courts) any attorney who knows how to make up insolvent court cost lists would have to study it out; have experience. That was known to Judge Kelly, the Judge of the City Court. . . Sometimes on or about the first of October 1947, I was requested to come to the office of Judge Kelly in the County Court House. Judge Kelly was Judge of the City Court at that time, and he is at the present time. . . I went up and talked to Judge Kelly. I don't think Mr. Terrell was present at any time I was talking to Judge Kelly. Afterwards I had conversations with Mr. Terrell in connection with this matter, fifty or seventy-five times. When I talked with Judge Kelly, Judge Kelly told me it had been agreed upon for me to make an audit the first of January 1946, or 1945, whichever it was, to November 22, 1947. I think it was two and three-quarter years. An audit of all insolvent costs and all costs with reference to the city court, including sheriff's, judge's and bailiff's fines, forfeitures, and fees. In other words, all fines in hands of officers of the court. Judge Kelly had approached me three or four times in regard to the matter. I declined to have anything to do with it. When he called me to the courthouse I came and this took place. Following my conversation with Judge Kelly I saw Mr. Terrell. As a matter of fact, at that time my office was in the building of the Fifth Avenue Drug Store, and Mr. Terrell's office was in the back end of the building, approximately forty to fifty feet from my office. Following this conversation with Judge Kelly, I immediately got hold of all the accusations in the clerk's office and put them in a big box, about eighteen inches square. They filled the box. I took them to the office and then consulted Mr. Terrell and got what he had in his office at that time. Then I spent around thirty days and parts of nights working on it. I would consult Mr. Terrell practically every day on various items of this insolvent cost. Under the law the solicitor is responsible for all fines paid and of the manner they are due to be paid to the solicitor. Then he has to account for them after paying all

officer's costs. *It was necessary, in determining these amounts* (what had been paid and what had not been paid, as you said) *to talk with Mr. Terrell in reference to it. I talked to him fifty or seventy-five times, I imagine. Mr. Terrell knew at all times what I was doing and he did not hesitate to cooperate with me all the way through.* When I had the first conversation with him I did not tell him about the conversation with Judge Kelly, but he knew about it. During all the conversations he never once said he did not agree to it or objected to me. He cooperated with me and never refused to give information I asked for. I talked to him frequently, fifty or seventy-five times. In checking maybe I would find an accusation missing. He would have it in his office. Maybe the cost was not right; he would have the record. Maybe I would find some paid and some not paid; he would correct it. He would also tell me how much money he had on hand not turned over. It was not the law but he agreed on it; money was paid into the hands of the clerk and the clerk made the distribution of cash and money to various officers. I think that kept up until about the first of August, 1947. Mr. Terrell then took charge of the fines after that. The clerk took no more fines or costs. I had to go to Mr. Terrell to see if various parties paid money, how much, and if it was paid to him. He would always tell me how much and so forth. As far as fines, forfeitures, and condemnation of automobiles, I also discussed with Mr. Terrell; especially anything I could not tell about. I did not go from item to item. That would have taken months . . I did know how many cases I actually had to check as to cost allowable, but I have forgotten the approximate [exact?] number. It ran through 1945 or 1946 and most of 1947. It ran 450 or 500 cases a year, I think, but I am not positive. I think it was 1300 or 1400 cases. . . Every one was turned over to me. Judge Kelly wanted a report by the twenty-second of November 1947. Wanted it then by all means. I got all the accusations I could find in the clerk's office and took all Mr. Terrell turned over to me; I did not check the docket with each accusation because the number on the accusation was the same as the number on the docket because I would not have had time to make a report by the twenty-second of November. In getting the accusations and papers I

asked Mr. Terrell to turn over all the papers he had, and I made the same request at the clerk's office and at the sheriff's office. All the way through he kept handing me another. Those things were scattered around in three offices. Some were never turned over to me at all. I worked about thirty days until ten or eleven at night and Sunday afternoons. I gave practically my entire time. I gave my entire time. On the report here is a letter to Judge Kelly dated November 5, 1947. That is the time I turned it over to Judge Kelly. On November 28, 1947, Judge Kelly entered an order on the audit. My recollection is that I was present at the time the audit was approved by Judge Kelly. I don't think Vaughn Terrell was right there then. Of course I can't tell what Judge Kelly said in the conversation but we had a conversation. I never talked to Vaughn Terrell about the report. Following the filing of the report Mr. Jolly and Mr. Horton paid me their prorata portion. It was $500 each. In my experience as an attorney and in my knowledge of matters of that kind, $1500 is a reasonable charge for that. I would not want to do it again for any price. I would not want to fool with it." It is readily conceded by counsel on both sides, and we think, correctly, that the plaintiff in this case was no such an auditor as is contemplated by Code §§ 10-101 and 10-102; that is to say, in order to draw a distinction, he was not a "judicial auditor." It is obvious that he was not an arbitrator within the contemplation of the arbitration laws. Code, § 7-101. There was, so far as the record shows, no disagreement as to rights and liabilities. From the foregoing evidence and the plaintiff's petition, it appears that the plaintiff's employment in auditing the insolvent cost lists was more in the nature of a "commercial audit." There was no case pending in which the necessity for a preliminary or tentative investigation would have authorized the appointment of a court, or judicial, auditor. It was the duty of the officers involved to submit these lists at regular intervals to the court for approval, this they had failed to do for a period of more than two years. Their failure to do so could have subjected them to a money rule by the court. Instead of ruling the officers, the court apparently chose to have them agree to have an experienced person prepare for them the insolvent costs for his approval. We think that the jury would have been au-

thorized, under these circumstances disclosed by the evidence, to infer that the officers including the present defendant agreed to this procedure and that an agreement to pay for the services rendered (although there may have been an absence of an express agreement) was implied. There was evidence of the request that the plaintiff perform the work, evidence of the specialized nature of the work, evidence of the time required to perform the task, evidence of the reasonable value of the services, and evidence of the defendant's knowledge of, acquiescence in, and co-operation in the project. The elements of an action upon an implied assumpsit, a quantum meruit, could have been found by the jury to be present in this case, and we think that clearly, under the pleadings and evidence, the suit was brought upon a quantum meruit and was in no wise an effort to collect an auditor's fee; that is a "judicial auditor's" fee, which would have been fixed by the city court. The superior court had jurisdiction of the subject matter and of the parties plaintiff and defendant, and consequently erred in dismissing the suit for lack of jurisdiction.

*Judgment reversed. Gardner and Townsend, JJ., concur.*